Thelma BOWE et al., Plaintiffs,

v.

**COLGATE–PALMOLIVE COMPANY et al., Defendants.**

**No. NA 66–C–20.**

United States District Court
S. D. Indiana,
New Albany Division.

June 30, 1967.

Supplemental Finding of Fact and
Judgment Sept. 12, 1967.

David L. Gittleman, Louisville, Ky., Daniel B. Burke, Jr., New Albany, Ind., for plaintiffs.

Hubert T. Willis, Middleton, Seelbach, Wolford, Willis & Cochran, Louisville, Ky., Richard C. O'Connor, Telford B. Orbison, Orbison, Rudy & O'Connor, New Albany, Ind., Thomas C. Galligan, Associate Gen. Counsel, Colgate-Palmolive Co., New York City, for Colgate-Palmolive Co.

Herbert L. Segal, Louisville, Ky., David E. Feller, Washington, D. C., Max F. Page, Indianapolis, Ind., for Union.

## MEMORANDUM DECISION

STECKLER, Chief Judge.

### The Pleadings

Complaint was filed in this cause on March 30, 1966, by certain named female employees of the Colgate-Palmolive Company's Jeffersonville, Indiana,[1] plant on behalf of themselves and on behalf of the class consisting of all females employed at the Jeffersonville plant. For brevity the defendant Colgate-Palmolive Company hereafter will be referred to as the "Company" or "Colgate." Joined as defendant was International Chemical Workers Union, Local #15, hereafter called the "Union," against which, however, plaintiffs sought no relief. The term "employees" will be used hereafter to refer to those employees of Colgate who are members of the bargaining unit at the Company's Jeffersonville plant.

The complaint as amended alleged that Colgate's operations at the plant were within the purview of the Civil Rights Act of 1964 and, more particularly, Title VII thereof, 42 U.S.C. § 2000e et seq. The complaint charged that Colgate intentionally discriminated against female employees at its Jeffersonville plant by a system of segregation and classification by sex whereunder females were deprived of certain employment opportunities in some job classifications, and that layoffs occurring during 1965 were discriminatory to females because such layoffs were made from separate

[1]. So-called because of its post office address, though the plant is located in Clarkesville, Indiana.

male and female seniority lists. The complaint further alleged that the plaintiffs had filed charges with the Equal Employment Opportunity Commission, hereafter referred to as the "EEOC," prior to instituting suit and that plaintiffs had been advised of the EEOC's inability to resolve these charges. Jurisdiction of this court was predicated on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f). The complaint also claimed that the defendant Union had participated in the discriminatory acts charged against Colgate.

The original complaint was amended on April 22, 1966, to allege that the plaintiffs received notification from the EEOC on or about April 5, 1966, of their right to institute action in court under the Civil Rights Act of 1964 and to place in the pleadings a copy of an EEOC decision relating to sex discrimination charges filed against the Company by employee Verner Boothe. On September 20, 1966, the plaintiffs moved to amend to allege that Colgate's acts of sex discrimination were continuing and that Colgate, with the complicity of the Indiana State Employment Service, was hiring only male employees and refusing to hire women because of their sex. This motion coming on the day of trial was denied.

On April 28, 1966, a motion to intervene and intervening complaint was filed by fifteen additional female employees. The intervening complaint contained essentially the same allegations against Colgate and the Union as the original complaint. The Court granted the motion to intervene on April 28, 1966. On May 2, 1966, defendant Colgate filed objections to plaintiffs' motion to file the amended complaint of April 28, 1966, to the intervention of the fifteen additional plaintiffs and to the filing of the intervening complaint. Defendant Colgate's objections were subsequently overruled on September 1, 1966.

On May 17, 1966, defendant Colgate filed various motions attacking the original complaint, the amended complaint, and the intervening complaint.

Colgate's motions sought dismissal of the complaints on the grounds of failure to exhaust contractual remedies, failure to exhaust administrative remedies, failure of the EEOC to attempt resolution of the alleged discriminatory practices by the methods of persuasion and conciliation set forth in the Civil Rights Act of 1964, misjoinder of parties plaintiff, improper class action, that the cause was not a proper one for injunction, dismissal of any claims asserted which arose prior to July 2, 1965—the effective date of the Civil Rights Act of 1964, failure to join indispensable parties, and on the ground that some of defendant Colgate's actions complained of were barred by the limitation provision of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5. These motions were disposed of by the Court on September 1, 1966, as will appear later.

In their original complaint, plaintiffs sought to enjoin defendant Colgate from engaging in the claimed unlawful employment practices. On June 3, 1966, plaintiffs moved for a preliminary injunction restraining defendant Colgate from, *inter alia*, restricting General Labor jobs to males, transferring females with seniority out of their regular department absent a crew reduction and to require Colgate to accord females the same privileges as males in exercising their seniority on open jobs in the plant. Colgate immediately filed an objection to the plaintiffs' motion for preliminary injunction, as did the defendant Union.

On June 28, 1966, the Court heard arguments of the parties on the defendant Colgate's pending motion to dismiss on the ground that the plaintiffs had failed to exhaust the grievance and arbitration procedures available to them through the collective bargaining contract between defendant Union and Colgate.

On July 19, 1966, the Court heard further argument on the defendant Colgate's motions to dismiss for failure to exhaust contractual remedies and on plaintiffs' motions for a preliminary injunction. The Court denied relief by

way of preliminary injunction at this time and reserved ruling on defendant Colgate's motions until the pretrial conference on September 1, 1966. The case was assigned for trial on September 20, 1966.

On August 1, 1966, defendant Colgate filed a motion to stay pending arbitration under the authority of the United States Arbitration Act, 9 U.S.C. § 3. In the interim between July 19th and the pretrial conference four more Colgate female employees filed a motion to intervene as plaintiffs and an intervening complaint. This intervening complaint essentially reiterated the allegations of the original and first intervening complaints, except part of the relief demanded as to these complainants was rehire since they had been permanently laid off on April 2, 1965. Colgate objected to the application of the four above-mentioned females for intervention and also to the second intervening complaint filed in their behalf. Defendant Union took no position on the motion to intervene, but did file an answer to the second intervening complaint.

Defendant Colgate on August 5, 1966, moved the Court to view each of its defensive motions previously filed as two motions, one for the purpose of dismissal in so far as they related to plaintiffs' claims for money damages and the other, in so far as they related to the demands for injunctive relief.

On September 1, Colgate filed a motion to require plaintiffs to elect whether they desired to pursue their remedy against the Company in the suit or through the grievance and arbitration machinery of the collective bargaining agreement. In connection with the motion for election Colgate sought to enjoin the plaintiffs from proceeding both in this cause and under the arbitration provisions of the collective bargaining agreement as to any particular alleged act of discrimination.

On September 1, 1966, defendant Colgate filed a cross-claim against the defendant Union for indemnity and contribution in the event any liability was imposed on Colgate for the alleged discriminatory employment practices.

Pretrial conference was held on September 1, 1966. At the conference the Court denied plaintiffs' motion for a preliminary injunction. The Court also overruled for lack of merit Colgate's motion to set aside the Court's entries of April 28, 1966, and May 6, 1966, which permitted the intervention of the additional plaintiffs, and also permitted the filing of the first and second intervening complaints and the first amended and supplemental complaint.

### Disposition of Defensive Motions

The Court took up Colgate's defensive motions and disposed of them as follows:

1. The Court overruled Colgate's motion to dismiss the complaints on the ground that each of the plaintiffs failed to exhaust her remedies under the grievance and arbitration provisions of the collective bargaining agreement between Colgate and the defendant Union. Defendant Colgate asserted, in support of this motion, that Title VII of the Civil Rights Act of 1964 was part of the fabric of our national labor laws and policy, and, as such, was subject to the principles developed under the national labor laws. In particular, Colgate claimed that the holding of Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), and other cases of similar import, which compel an employee to exhaust the remedies of grievance and arbitration provided by a collective bargaining contract between his union and his employer before filing suit to vindicate a claimed injustice, controlled in this case. The Court disagrees. The Court finds a fundamental difference between a claim for the violation of a collective bargaining agreement and a claim for the violation of the Civil Rights Act of 1964. The latter is a statutory embodiment of constitutional rights that all persons are entitled to enjoy, while the former has as its primary purpose the maintenance of industrial peace between labor and management. It is the belief of the Court that an employee

has the right to come before the Court and assert his claim under the Civil Rights Act of 1964, without regard to any contractual remedies also available to him. However, it is also the belief of the Court that the employee should not be permitted to proceed on the same allegedly wrongful incidents both in the Court and pursuant to his contractual remedies.

2. Colgate's second defensive motion sought dismissal of the complaints for failure of the plaintiffs to exhaust their administrative remedies before the EEOC. In support of its motion Colgate cited § 706(e) of the Act, 42 U.S.C. § 2000a–5(e). The Court overruled Colgate's motion in so far as it sought dismissal of the complainants' demand for injunctive relief. It would be unrealistic to require an employee whose rights are threatened with irreparable harm to exhaust his remedies before the EEOC prior to seeking injunctive relief from the Court. On the other hand, the Court is convinced that no action for damages or reinstatement under the Act can be maintained by those employees of defendant who failed to file timely charges with the EEOC, or who, filing charges, did not receive a communication from the EEOC indicating that probable cause existed to believe that a violation of the Act had occurred. The Court agrees with the reasoning of Hall v. Werthan Bag Corp., 251 F.Supp. 184 (M.D.Tenn.1966) on these points. Thus, the Court ruled that each plaintiff would be required to demonstrate by sufficient proof that she had filed a charge with the EEOC and received a letter of probable cause before she could become eligible to collect damages or seek reinstatement or employment preference with Colgate. This is a jurisdictional prerequisite. Hence, Colgate's motion to dismiss for failure to exhaust administrative remedies was sustained in part and overruled in part.

3. Defendant Colgate's third motion was concerned with dismissal for failure to induce the EEOC to conciliate the alleged complaints of the plaintiffs with Colgate. This motion is merely an adjunct to Colgate's second motion set forth in the preceding paragraph. So long as complainants individually can demonstrate that they filed charges with the EEOC and received a letter of probable cause from it, their causes for damages and reinstatement are ripe for determination by the court. Cf. Evenson v. Northwest Airlines, Inc., 268 F.Supp. 29 (E.D.Va.1967). And even those plaintiffs who have not filed charges are entitled to be heard on the issue of injunctive relief. Hall v. Werthan Bag Corp., supra.

4. The Court overruled Colgate's fourth motion to dismiss for improper joinder of parties plaintiff as without merit. This is a class action and the Court is able to fashion the relief appropriate to each individual plaintiff in the class, which that plaintiff is entitled to receive.

5. The Court overruled Colgate's motion to dismiss an improper class action.

6. The Court also overruled Colgate's motion to dismiss the plaintiff's prayer for injunctive relief. Ultimately, however, as will be shown later, the Court found that injunctive relief is not warranted.

7. Colgate's seventh defensive motion concerns dismissal of those parts of the complaints which seek relief from acts occurring prior to July 2, 1965. This motion was sustained by the Court. The effective date of the Civil Rights Act of 1964 was July 2, 1965, and the Act is only prospective in its application. Any acts by the defendants violative of the Act which occurred prior to July 2, 1965, cannot be made the subject of this action and were not proscribed by the Act. The record shows, for example, that certain female employees were laid off by Colgate in April 1965, from a seniority list restricted to women. This layoff was not violative of the Act since the Act was not then in effect. Further, the women employees laid off in April 1965 are not entitled

to damages after the Act became effective and up to the dates of their recall unless they demonstrate that they took some affirmative action directed to Colgate after July 2, 1965, to obtain reinstatement. This they failed to prove.

8. The Court overruled Colgate's motion to dismiss for failure to join indispensable parties, for lack of merit.

9. The Court sustained Colgate's ninth defensive motion to dismiss complaints barred by the limitations provisions of the Civil Rights Act of 1964. Section 706(d), 42 U.S.C. § 2000e–5(d), provides that a charge of unlawful employment practice must be filed by the employee with the EEOC within ninety days after the alleged unlawful employment practice occurred. The Act further provides in § 706(e), 42 U.S.C. § 2000e–5(e), that an employee must commence his action in district court within thirty days after the EEOC notifies the complainant that it has been unable to obtain voluntary compliance from the employer in resolving the unlawful employment practice. Employees who do not file charges with the EEOC within ninety days after the occurrence of an alleged discriminatory employment practice are barred by the Act from recovering damages or reinstatement. However, those female employees of Colgate who did file timely charges with the EEOC and who received from the EEOC a letter of probable cause are entitled to relief, as herein granted.

10. Colgate's motion to stay proceedings pending arbitration was also overruled. This motion was predicated on the United States Arbitration Act, 9 U.S.C. § 3, and was overruled for the same reasons that Colgate's motion to dismiss for failure to exhaust contractual remedies was overruled.

11. Colgate's motion to have the Court consider each of the preceding defensive motions as separate motions, relating to plaintiffs' claims for money damages on the one hand, and to their claims for injunctive relief on the other, was sustained.

12. The Court next overruled Colgate's objections to the intervention of four additional plaintiffs. In permitting their intervention and the filing of the intervening complaint, the Court expressly made their claims subject to its rulings on Colgate's defensive motions as herein set forth.

13. The last defensive motion filed by Colgate concerned an election of remedies by the plaintiffs to preclude pursuance of a remedy in this cause and through the grievance and arbitration machinery of the collective bargaining agreement. It would be unfair and inequitable to an employer to permit an employee who claims discrimination because of sex to proceed against the employer for damages and reinstatement, and at the same time or later proceed against the employer for damages or reinstatement or employment preferences, for the same acts, under the grievance and arbitration provisions of a collective bargaining agreement. Hence, the motion for election of remedies was sustained.

By order dated September 9, 1966, the Court ruled that each named plaintiff in the action and each unnamed member of the class represented therein would be required to elect whether she would proceed with her claims, based upon alleged sex discrimination by Colgate or the Union, or whether she would proceed with her claims through the grievance and arbitration procedures of the collective bargaining agreement. The Court ordered further that each named plaintiff and each member of the class shall be deemed to have elected to prosecute her claims of alleged sex discrimination in this action unless she promptly filed with this Court and served upon counsel for Colgate and the Union, a disclaimer of any interest or participation in this action, in which case she could prosecute her claims through the grievance and arbitration machinery of the collective bargaining agreement. The Court also ordered that each named plaintiff and each member of the class represented herein who did

not file and serve such disclaimer, and the defendant Union and all other persons to whom actual notice of this order and injunction came, were barred and enjoined from filing or prosecuting any claims, based on asserted sexual discrimination in violation of Title VII by Colgate, under the grievance and arbitation procedures of the labor agreement between Colgate and the defendant Local. This order and injunction are limited in their application to claims as may have arisen before and during the pendency of this case in this court and are not applicable to any such claims as may arise after the entry of judgment in this Court. It may be noted that no disclaimers were filed with the Court by female employees of Colgate.

At the conclusion of the pretrial conference on September 1, 1966, defendant Colgate filed its answer to the complaint, the amended and supplemental complaint, the first intervening complaint and the second intervening complaint. And on September 16, 1966, Colgate filed a supplemental answer to the second intervening complaint.

On September 7, 1966, defendant Union moved the Court to dismiss the complaint and cross-claim as to it. Ruling was reserved on this motion pending completion of the trial on the merits and is treated hereafter in this memorandum.

In early September 1966, defendant Union filed its answer to the cross-claim and shortly thereafter, on September 21, 1966, while trial was in progress, moved the Court for leave to file an amended supplemental answer to Colgate's cross-claim and for leave to file a cross-claim against Colgate. The motion was granted and Colgate's answer was filed in due course.

The trial of this action was conducted over seven nonsuccessive weeks commencing September 20, 1966, and ending December 1966. The Court having duly considered the evidence, the post-trial briefs and arguments of counsel, now makes the following findings of fact and conclusions of law based thereon:

## FINDINGS OF FACT
### Historical Background

The Colgate-Palmolive Company is engaged and has been engaged for many years in the manufacture and sale of soaps and detergents, dentifrices, shaving creams, shampoos and other toilet preparations, and soaps and detergents for industrial purposes.

The Company has domestic manufacturing plants at Jersey City, New Jersey, Kansas City, Kansas, Berkeley, California, and Jeffersonville, Indiana.

All four domestic plants of the Company produce the same brands and kinds of products with minor exceptions. The managers of the four plants report to the Director of Manufacturing, Mr. Albert R. Tucker.

The plant hourly employees at the Jeffersonville plant are members of and are represented for collective bargaining by Local Number 15, International Chemical Workers' Union. This Union does not represent any of the Company's employees at any other domestic location.

Although the employment levels at Colgate differ from time to time, this action concerns approximately 160 female employees and some 900 male employees.

The work force at the Jeffersonville plant is divided into seventeen seniority groups, including the Maintenance Department, which in turn is divided into eight sub-groups constituted largely of skilled craftsmen, such as mechanics, electricians, carpenter-millwrights and the like. The Toilet Articles Division, which is the principal focus of this action, is divided into two departments called the Toilet Articles Making Department and the Toilet Articles Finishing Department. They are both under the supervision of Mr. Niles Schoening. The Toilet Articles Making Department is located in Building #40. The Toilet Articles Finishing Department, sometimes called "T. A. Finishing Department" or "T. A. Finishing," about 400 feet long by 250 feet wide, is also located in Building #40 and

includes some twenty production lines which have the function largely of filling tubes, bottles and other containers with products brought there from other departments, especially the Toilet Articles Making Department. There are included in the Toilet Articles Finishing Department the collateral functions of supplying lines with containers and ingredients and removing finished products to the Shipping Department.

At the beginning of the war years, 1942–1945, there were very few female employees employed in the Jeffersonville plant. In 1942 the Company commenced manufacturing Toilet Articles in Jeffersonville and at that time placed women on light task jobs in the Toilet Articles Finishing Department. At the same time, because of the war and the demand for men in the military services, the Company began to employ women on other production jobs formerly filled by men. Many jobs were changed in content in such a way as to delete from them heavier physical work elements leaving only the lighter portion of the heavier jobs for the women to perform. These jobs were "tailor made" for performance during the war by females, so that they might perform the work at a steady pace and without undue strain. The proof (by a forewoman of that time) establishes that during those war years a weight limit for lifting or carrying by females was fixed at a maximum of twenty-five pounds and that when a job required the lifting or carrying of weights in excess of that amount, the job was so rearranged that the excessive weights could be handled by male employees. This was demonstrated by the introduction of the war-time notebook showing a number of job descriptions and the duties and functions deleted therefrom to make them susceptible to performance by the female employees of that time. Other jobs which involved lifting of twenty-five pounds or less which were formerly filled by men only were filled during the war years by women who received the same rate of pay as men on the job.

As the men began to come back from the war and to their jobs, there was some concern to preserve certain light task jobs for female employees, and as a result of this endeavor on the part of the Union and the Company the female employees were given the exclusive right to perform the Finishing Labor jobs in the Toilet Articles Finishing Department, and in the same way certain jobs were preserved for the female employees in the Shipping Department, in R & I (Soap Warehouse) and in the Sanitation Department, and the Cafeteria.

The General Labor jobs throughout the plant and the Finishing Labor jobs, except as noted above, were preserved exclusively for males, many of whom were returning servicemen.

Separate seniority lists were made and kept, one for males and one for females. The labor contracts between the Company and the Union from the war years through the 1963 contract required these separate seniority lists. Although the 1963 contract expired on October 1, 1965, the Union and the Company were in negotiations for a new contract and the old one was continued in effect from day to day by mutual agreement so that it was being maintained in effect in November of 1965.

### The Seniority System

The successive agreements between Colgate and the Union dealing with seniority, and the testimony concerning the practices and understandings of the parties in operating the seniority system, reflect a mutual response by the Company and the Union to the practical necessities of the operation of the Jeffersonville plant. Unlike many plants, the Jeffersonville plant does not produce the same products in the same proportions from week to week. A great variety of products is manufactured at the plant and there is a considerable variation from week to week in the particular products being manufactured and, therefore, in the particular jobs being performed in the plant. There are 542 job classifications in the plant, only about 300 of which

function each week. It follows that, unlike the situation in most industrial plants, individual employees in most departments at Colgate do not have permanent jobs. Jobs are assigned and reassigned each week on the basis of the products which are expected to be produced during that week. Indeed, there are sometimes changes from day to day. The seniority system in effect at the Jeffersonville plant developed· as a method of providing job security and promotional opportunity based on seniority, while at the same time providing the flexibility necessary to meet the changing job requirements at the plant. While it is different than most seniority arrangements, its unique features are a function of the particular plant environment in which it was developed.

As in many industrial plants, the jobs in the Jeffersonville plant are divided into a number of departments and the particular job to which an employee is assigned within a department depends upon his departmental seniority, i. e., the length of his service in that department. Unlike most plants, however, this assignment is not a permanent one but is made anew each week.

This process is known as "crewing up." The means by which employees obtain recognition of their seniority is the "preference sheet." In some departments these were called "choice sheets" prior to the current agreement. The difference is irrelevant. Each employee is expected to file, or to have on file, a sheet showing the jobs and the shifts he prefers in order of his preference. During each week each department in which this system is used learns which jobs will be scheduled for the following week and jobs are then assigned, within the department, by assigning employees in accordance with their preference sheets, giving the prior choice to the senior employee. The system is not used in the Maintenance Department and the Power Plant where the manpower requirements do not fluctuate from week to week and specialized skills are involved. The procedure is simply to put the preference sheets in a book in order of departmental seniority, with the employee having the highest seniority first, the employee with the second highest seniority second, etc. The person making the assignments uses the schedule showing the jobs which must be filled and then proceeds through the seniority book, assigning the employees in order of their seniority to the available jobs, giving each employee in turn the then vacant job which is highest on his preference sheet. The most senior employee thus gets whatever job he wants of the jobs to be worked in a particular week. If only one employee is to work that job, the second employee cannot have that job even if he lists it first on his preference sheet, but will obtain his next choice. The process continues until either all of the jobs are filled or the list of employees having departmental seniority is exhausted.

If, when a particular employee is reached in this process, all of the jobs for which he has indicated a preference have been filled, the employee is assigned to the highest rated job then vacant on the day shift. If all jobs on the day shift are filled, he is assigned to the highest rated job on later shifts. The same procedure is used when there is no preference sheet on file for a particular employee or if he files a blank preference sheet. In other words, each employee is assumed, unless he indicates to the contrary, to prefer jobs in order of their rates and to prefer work on the first shift to work on other shifts. An immaterial variation exists in the T. A. Finishing Department as to Finishing Labor jobs, which are assigned "from left to right" rather than in order of pay scales. Since there are only two rates of pay for Finishing Labor jobs, this difference is of minimal importance. An employee will be assigned, on the basis of this assumed preference, to jobs which he has not indicated on his preference sheet if all of the jobs which he has indicated have been filled by more senior employees.

If the number of employees having departmental seniority is the same as

the number of jobs to be filled within a department in any week, this is the end of the process. Further adjustments must be made, however, if there are more employees with departmental seniority than there are jobs in that department in a particular week. This problem is met in different ways, depending on the balance of employees and jobs in other departments. If, in another department, the converse has occurred, i. e., there are more jobs than employees with departmental seniority, employees may be transferred to that department from any one of seventeen departments depending upon the departmental seniority these may have in the department increasing its needs. If there are no such specific jobs but there is labor work to be done in the plant, the excess employees are assigned as "surplus labor." Preference sheets are concerned with surplus labor in that they contain a place to allow the employee who may be designated as "Surplus Labor" a choice of shift. Preference sheets can be filed by an employee with respect to jobs in departments in which they hold departmental seniority, and by Surplus Labor for choice of shift. If they are "forced out" of that department because of the unavailability of work, their assignment is made by the Company in its discretion and may be governed by preference sheets as to choice of shift. The contract provides, in Section 6(c), that employees classified as "Surplus Labor" will have no choice of job.

If there are compensating vacancies, or Surplus Labor jobs available, this ends the problem. If there is no such work available, then there is a surplus of labor in the plant as a whole and some employees must be laid off. When this situation occurs, the contract provides that layoffs will occur in the inverse order of plant seniority—not departmental seniority. Hence, when there is an excessive number of employees available in relation to the work available, the employees with the least seniority in the entire plant are laid off. If those employees happen to be the employees with the lowest departmental

seniority in the department in which operations are being reduced, then the situation resolves itself: those left over after that department "crews up" in the order of departmental seniority are laid off. If there are, however, employees in other departments who have lesser plant seniority, it is those junior employees who are laid off—even though in their departments there is no excess of labor over jobs. Their layoff, in turn, creates vacancies which are then filled with the surplus employees from the department in which forces are being reduced. In the terminology of the collective bargaining agreement, those employees are "forced in" to the other departments.

In the converse case, where there are more jobs in a department than employees having seniority in that department, the jobs are "open" and employees in other departments may bid for transfer to the vacant job on the basis of their departmental seniority in the department to which transfer is sought. In the absence of such bids, the vacancies are filled by employees who are not needed in other departments, if there is such a surplus of employees. If there are no bids for the vacant jobs, and no surplus in other departments, then the jobs must be filled directly by new employees.

All of the above relates to the so-called "Monday-assigned" jobs—the "crewing up" for the week based on the anticipated work requirements during that week. There are also changes in jobs during the week as a result of unanticipated developments. Production requirements can change unexpectedly during the week, going either up or down. These changes are frequent. And there is, inevitably, some unexpected absenteeism.

Preference sheets have no role in the assignment and reassignment of employees to jobs occasioned by changes in production requirements or by absenteeism during the week. If a during-the-week change results in vacancies, i. e., a job is either "open" because the as-

signed employee is absent or "non-scheduled" because it was not originally scheduled to be worked, employees within the department in which this occurs can exercise their departmental seniority to obtain the job in question. The contract limits this right, however, and an employee can exercise his departmental seniority in such circumstances only to improve his job rate and only after other employees who may have been affected by the change causing the vacancy have been utilized. If the change results in an excess of employees, as where a scheduled job is closed down during the week, the affected employees may exercise their departmental seniority with respect to other jobs on the shift in the department. Extra employees may be transferred to other departments where work is available. Extra employees may be transferred to other departments where work is available if they are youngest in seniority in the department from which they are being transferred. The labor agreement provides that employees can be sent home "if an emergency breakdown, rail embargo or any other unforeseeable situations occur * * *," but then it is on the basis of departmental seniority and not on the basis of the employees affected. The only provision to pay for the balance of the week is in the event of layoff. The only employees that can be laid off are those with the least plant seniority of all the employees. The employees affected in a department during the week as a result of changes would not normally be the youngest employees in the plant.

The system has other refinements, such as a series of rules as to how departmental seniority is calculated when an employee transfers or is forced into another department and a series of rules as to rates to be paid when assignments are changed, but the above description summarizes the relevant parts of the system. The system, as so described, is subject, however, to two major qualifications. Those two qualifications, and their interrelationship, create the issue in this case.

The first major qualification is that the system, as described, operated under the 1963 agreement, and prior agreements between Colgate and the Union, in two separate compartments. As mentioned previously, certain jobs within the plant were exclusively female jobs and male employees were not eligible for assignment to them. Other jobs were exclusively male jobs and female employees were not eligible for assignment to them. There were no "common" jobs and the two compartments operated independently of each other in so far as the application of seniority was concerned. Within the female compartment, the system operated as described above but only female employees were considered and only the jobs set aside for female employees were filled. Within the male compartment, also, the system operated as described above, but the comparison of seniority was solely between male employees and the jobs to be filled were only the "male" jobs. The use of preference sheets, the procedures used with respect to "force ins" and "force outs" when there was either an overage or a shortage of labor in a particular department, the rule for layoffs in the plant—all of these are operated separately for men, who were considered only for the male jobs, and for women, who were considered only for female jobs.

One result of this separate application of the seniority system to males and females was that it was possible, and indeed often occurred, that female employees would be laid off on the basis of their plant seniority as compared to other female employees, while male employees with less plant seniority were retained. (This is in fact what happened in the layoffs in 1965 which gave rise to this lawsuit.) The opposite result could also occur, and did, although not since Title VII of the Civil Rights Act of 1964 became effective. If there was a reduction in the work available for male jobs, males could be laid off on the basis of their plant seniority as

compared to other males, while females with less plant seniority were retained.

The distinction between male and female jobs was set forth in the 1963 agreement. Appendix L to that agreement defined a category of jobs known as "Finishing Labor." A Finishing Labor job was defined as any job in which a woman can physically perform all the duties, with specific examples to give the definition content. Appendix L further restricted Finishing Labor jobs to ten departments. Finishing Labor jobs were classified, for pay purposes, under a different system than the system used for classifying other jobs, which were known as "General Labor" jobs. Finishing Labor jobs were classified in grades 1 through 4. General Labor jobs were classified in lettered classes from C up through U. The highest rate for a Finishing Labor job under the 1963 agreement was identical with the lowest rate for a General Labor job. Despite the statement in the 1963 agreement that a Finishing Labor job was one in which a woman can physically perform all the duties, the division between male and female jobs was not identical, under that agreement, with the division between Finishing Labor and General Labor jobs. As stated previously, female employees were restricted to Finishing Labor jobs in five departments: Toilet Article Finishing, Shipping, R & I (soap warehouse), Sanitation, and the Cafeteria. Finishing Labor jobs in those five departments constituted the female compartment. All the remaining jobs constituted the male compartment. The male compartment thus consisted of all of the General Labor jobs plus the Finishing Labor jobs in six departments. Both Finishing and General Labor jobs in those departments were assigned in accordance with male departmental seniority. Layoffs from the plant were made separately from male jobs and female jobs on the basis of male and female seniority unrelated to the distinction between General Labor and Finishing Labor jobs.

In the "new" agreement, effective April 25, 1966, the contractual distinction between male and female jobs was abandoned. The distinction between Finishing Labor and General Labor jobs was, however, retained. The definition of Finishing Labor was changed so as to describe such jobs as "light task" jobs, rather than as jobs a woman could perform, but the specific content remained the same. The contractual requirement that male and female employees be considered separately for male and female jobs was eliminated. Instead, Colgate considered female employees as eligible only for Finishing Labor jobs, with the exception of ten General Labor jobs open at that time.

As a result of the contractual change, all jobs in the plant became open to males. In considering the assignment of male employees, the seniority system as described above is applied with respect to all of the jobs within the bargaining unit, both General Labor jobs and Finishing Labor jobs, whether those jobs were previously classified as male or female jobs. Female employees, on the other hand, were not considered for all jobs but, with the exception of ten General Labor jobs, only for Finishing Labor jobs.

The basis for this distinction is claimed by Colgate to be a determination that all General Labor jobs, except for these ten, involved the lifting or carrying of weights in excess of thirty-five pounds. Originally, two General Labor jobs, in the T. A. Finishing Department, were made available to female employees by Colgate, even under the "new" agreement. As a result of grievances processed by the Union because of the refusal of Colgate to assign General Labor jobs to female employees in the T. A. Finishing Department, two additional jobs in that department were made available to female employees. The remaining General Labor jobs made available to female employees—three in the Toilet Soap Department and three in the Spray Soap Packaging Department—were made

available as the result of Company assignments when there was an excess of female labor in the T. A. Finishing Department.

No weight limitation is contained in the collective bargaining agreement. The Union which negotiated that agreement has protested the limitation and seeks, by its cross-complaint against Colgate, to have such limitation set aside as violative of Title VII of the Civil Rights Act.

Determination of the propriety of the 35-pound weight limitation under the collective bargaining agreement, wholly apart from the provisions of Title VII, must necessarily be made by the Court in light of its order of September 9, 1966, requiring female employees to elect whether to process their claims under the collective bargaining agreement or in this suit. Under the agreement, claims may be processed as grievances which arise from disagreements "over the interpretation, performance, or application" of the terms of the agreement. Under Title VII this Court has jurisdiction to adjudicate claims of violation of that Title. By its order the Court has also required that claims as to the proper "interpretation, performance or application" of the collective bargaining agreement be adjudicated in this suit, in so far as they relate to the denial to plaintiffs of jobs to which, were they males, they would be assigned.

As stated, the agreement contains no provision specifying a weight limit on jobs to which female employees may be assigned. Nor does the "new" agreement limit female employees to Finishing Labor jobs. The justification for such a limitation, both under Title VII and the agreement, therefore must be found in the provisions relating to the ability of employees to perform jobs to which they seek assignment under the seniority provisions of the agreement.

It is the "ability" provision which constitutes the second major qualification to the seniority system described above. The qualification is a disputed one. The agreement provides that assignments shall be made, both within a department on the basis of departmental seniority and in cases of layoff and reemployment in accordance with plantwide seniority, "consistent with the ability to perform the work required." Certain witnesses testified that, despite this contractual limitation, assignments were made strictly in accordance with seniority, and without consideration of individual variations in the ability to perform the required work, except in cases of known and obvious physical limitations, such as the absence of a limb. Other witnesses, to the contrary, testified that every assignment was made on the basis of an evaluation that the employee being assigned was able to perform the work required.

The testimony with respect to this issue largely related to the assignment of jobs under the "old" agreement, when the jobs were either exclusively male or female. The Court finds that, under the prior agreement, the physical ability of individual employees to perform a job was not generally taken into account in the assignment of jobs. Assignments were made on the basis of seniority, without regard to individual qualifications, except in assignments to skilled trade or craft jobs and where an individual had apparent physical defects making him incapable of performing the work.

Concededly this sometimes resulted in the assignment of employees to jobs which they could not perform efficiently or as efficiently as other employees. But it was the practice in effect under the "old" agreement and, as such, Colgate felt obliged to continue it under the "new" agreement.

It is this fact which created Colgate's problem with the passage of the Civil Rights Act of 1964 and the consequent revision of the collective bargaining agreement to eliminate the categories of exclusively male and exclusively female jobs. Prior to that time it could, consistently with the maintenance of reasonable efficiency, assign men to jobs

requiring heavy lifting without regard to individual ability because most, if not all, men in its work force could perform such jobs efficiently. And it could, equally, assign female employees to female jobs without regard to their individual physical capacity since those jobs did not require the lifting or carrying of heavy weights.

With the elimination of the separate categories of male and female jobs, Colgate felt it necessary to take measures to insure continued efficiency. In order to meet the necessities of production Colgate introduced a limitation upon the jobs available to female employees as a class, based upon their abilities as a class. Jobs which most female employees could be expected to perform efficiently and without undue risk were made available for assignment to women without regard to their individual abilities. Jobs which most female employees could not be expected to perform efficiently and without undue risk were barred to all female employees, without regard to their individual abilities. This decision was not made for invidious motives but solely to meet the situation created by the elimination of the separate categories of male and female jobs.

### Layoffs and Filing of Charges with EEOC

On November 12, 1965, and a week later on November 19, 1965, a total of twenty-eight females were laid off by Colgate, and men younger in plant seniority were kept at work on jobs manned exclusively by men in accordance with the labor contract. This action ultimately precipitated this lawsuit which was filed on March 30, 1966. Six others, laid off on April 2, 1965, were kept on layoff in November 1965 and until May 16, 1966, when they were recalled with that as their new seniority date as fixed by the labor agreement. Three others laid off April 2, 1965, were not recalled at all because they had lost their rights of recall by the terms of the labor agreement.

A number of the females laid off (fifteen including the plaintiff, Georgianna Sellers, who testified about it), signed a grievance upon being given the antecedent notice of layoff. This grievance was handed by the females to their Union bargaining committeewoman, Mrs. Sarah Walker. The grievance protested the layoff as being a discrimination against them in violation of title VII of the Civil Rights Act of 1964. This grievance was never filed with the Company because, as it was proven, the President of the Union told the Bargaining Committeewoman that the grievance did not fall within the purview of the grievance and arbitration mechanism of the contract then in effect.

On or about November 15, 1965, fourteen of the women who had been laid off, upon the advice of the Union and its counsel and with their assistance and encouragement, filed charges of discrimination against Colgate with the Equal Employment Opportunity Commission. One more of them (Thelma Bowe) subsequently filed such a charge with the EEOC on or after December 6, 1965. Subsequently the women were told that the grievance which had been submitted to the Union would not be processed by the Union. Later the Union did file grievances with the Company under the new contract. For facility the plaintiffs who filed such charges are referred to as the "Charging Plaintiffs" and the plaintiffs who did not file such charges are referred to as the "Non-Charging Plaintiffs."

Of the fifteen Charging Plaintiffs, only twelve are named as plaintiffs in this action. There are twenty Non-Charging Plaintiffs in the complaints[2] (eight laid off April 2, 1965, and twelve laid off November 12, or 19, 1965). In addition, there were two women laid off who filed neither a charge nor a suit, and three who filed a charge but no suit.

2. Including in this category LaPaille and Hambough who filed charges too late, May 18, 1966.

The following chart will disclose at a glance the status of each of the named plaintiffs as found and now confirmed as proper by the Court:

Charging Plaintiffs—12

| | | |
|---|---|---|
| Bowe [a] | Moore | Bartle (Sturgeon) |
| Young | Casey | Boothe |
| Jackson | Huff | Blakely (Davis) |
| Sellers | Stum | Whittinghill |

Non-Charging Plaintiffs—16

| | | |
|---|---|---|
| Kirchgessner | Briscoe | Cochran |
| Whitman | Bell | Franklin [b] |
| Spriggs | Pangburn | Stumler [b] |
| Collier | Wells | LaPaille [c] |
| Jakubowski | Bussey | Hambough [c] |
| Muncy | | |

Non-Charging Intervening Plaintiffs—4

Eva Hall [b]
Shirley Hall [d]
Helton [d]
Shroyer [d]

[a] EEOC charge filed on or about 12/6/65.
Acknowledged by EEOC.
[b] Laid off 4/2/65. Rehired 5/16/66, with that as new seniority date.
[c] Laid off 4/2/65. Filed EEOC charge too late—5/18/66.
[d] Laid off 4/2/65. Recall rights lost. Not rehired.

The Court finds the following chronology to be accurate and to present at a glance the sequence of significant events in this controversy:

| | |
|---|---|
| July 2, 1964 | — Passage of Title VII of the Civil Rights Act of 1964. |
| April 2, 1965 | — Layoff of eight female employees—five named intervening plaintiffs and one original complainant, Hambaugh. |
| April 16, 1965 | — Female employee laid off with plant seniority of May 9, 1947, while male employees retained with plant seniority of April 27, 1964. |
| April 23, 30, 1965 | — Female employees laid off with plant seniority of May 7, 1947; male employees with plant seniority of January 21, 1963, recalled. |
| July 2, 1965 | — Effective date with respect to Colgate of Title VII of the Civil Rights Act of 1964. |
| July 5, 1965 | — Colgate recalled male employees with seniority as junior as February 4, 1963, failing to recall females still laid off with seniority as senior as May 7, 1947. |

| | | |
|---|---|---|
| August 2, 1965 | — | Colgate recalled male employees with seniority as junior as April 27, 1964, failing to recall females still laid off with seniority as senior as May 7, 1947. |
| August 31, 1965 | — | Presentation by Colgate to Union in negotiations, of proposal to "discuss effect of Title VII on contract provisions and work out necessary modifications in those sections which are affected by the new law." |
| September 1, 1965 | — | Presentation by Colgate of desexing proposals in full, written, complete and formal text. |
| October 1, 1965 | — | Original expiration date of the labor agreement preceding the current one. |
| November 9, 1965 | — | Grievance complaining of layoff given to Union bargaining committeewoman. |
| November 12, 19, 1965 | — | Layoff of 28 female employees of whom 12 filed charges with the EEOC and of whom 16 did not file charges with the EEOC. |
| November 26, 1965 | — | Filing of charges by 11 named plaintiffs and three other female employees. (On or about December 6, 1965, plaintiff Bowe filed charge.) |
| February 24, 1966 | — | Strike by employees of Colgate's Jeffersonville plant. |
| March 30, 1966 | — | Filing of original complaint by five charging plaintiffs and by eight non-charging plaintiffs. (Summons served April 7, 1966.) |
| April 1, 1966 | — | Date of notice from EEOC to 11 of the named plaintiffs who filed charges, that it had been impossible for the EEOC to undertake or conclude conciliation and the advice that they might, within 30 days of the receipt of that notice, institute a civil action in the appropriate federal district court. |
| April 19, 1966 | — | First attempt at conciliation by EEOC. |
| April 24, 1966 | — | Informal agreement upon terms to end strike. |
| April 25, 1966 | — | Signing of new contract and return of strikers to work, including all but three of the female plaintiffs laid off in November 1965. |
| May 16, 1966 | — | Recall of the three remaining plaintiffs laid off in November 1965 and six plaintiffs on layoff since April 2, 1965, with seniority starting on the recall date for the latter six. |

Before adverting to other sections of these findings, the Court should dispose of one peripheral matter suggested in the arguments and trial. It was shown that Colgate over the years and during 1965 and 1966 relied heavily upon the personnel records and facilities of the Indiana Employment Security Division and especially those of its office in New Albany, Indiana. On several occasions in arguments and in evidence there were implications that plaintiffs would show something in the nature of a conspiracy or connivance between Colgate and that office, or between the Union and that office, or among all three of them so as to discriminate against women and in favor of men in Colgate's hiring practices. It appears that the New Albany office by its nature and functions, had and has access to a large labor pool and that it attempts to secure employment for individuals from it. The evidence discloses that Colgate, some three months in advance of actual need, had and has to forecast a labor budget of the numbers and types of jobs likely to be in operation and the number and types of employees probably needed to fill those jobs. In consequence, during 1965 and 1966 Colgate's custom was to advise the New Albany office of the Indiana Employment Security Division of the character of jobs to be performed.

After the effective date of Title VII of the Civil Rights Act of 1964, and especially during the surge of employment at the plant following the strike, Colgate indicated to that office that it needed to fill a specified number of light task jobs and a stipulated number of heavy task jobs without any reference to the sex of applicants to be referred. The heavy task jobs were described as ones requiring strenuous physical effort and heavy lifting. In consequence, the New Albany office referred males appropriate to the heavy task jobs available.

In point of fact, there were thirty-four females recalled and hired by Colgate immediately after the strike was over and a short time later six more females were employed so that actually there were forty females recalled or hired by Colgate shortly after the strike. These represented some thirty percent of the female work force at Colgate. Then in late September 1966, Colgate hired seven more females. These seven came to Colgate on reference from the New Albany office of the Indiana Employment Security Division.

Some point was sought to be made by the plaintiffs of the fact that some 200 men were employed by Colgate in view of the necessity for increased production after the strike ended. However, it is noted that these 200 men represented a smaller proportion of the male working force at the plant than the percentage of female employees hired and recalled in relation to the total female work force.

The evidence in this case discloses without any possibility of doubt that there was never any conspiracy or connivance or any type of invidious nexus between the New Albany office of the Indiana Employment Security Division and Colgate or between that office and the Union or between Colgate and the Union or among all three of them. All three are found guiltless in this regard.

There are allegations in the plaintiffs' various complaints tending to imply some type of joint action between the Company and the Union aimed at discrimination on behalf of the male employees against the female employees. The evidence did not support such suggestion. On the contrary the evidence convinces the Court that no such evil or illegal cooperation existed and it is found that there was none.

*Negotiations, Contracts and Strike*

It has been the custom at the Jeffersonville plant for many years for representatives of Colgate and representatives of the Union to begin negotiations for a new contract a month or two before the expiration of the contract then current. The teams of negotiators usually meet at the plant for eight hours a day, five days a week, until a contract is achieved and this process takes several months for each contract.

The contract preceding the present one showed its effective dates as October 1, 1963 to October 1, 1965, but, as mentioned previously, it was continued in effect pending negotiation of a new contract. Some of its provisions are of interest in this action.

Section 6 of the contract entitled "Seniority" provides in part:

p. 8(a) Departmental seniority shall prevail consistent with the ability to perform the work required. In case of crew reductions, except for emergencies specified in paragraph (k), employees will be placed on jobs within their department in accordance with their departmental seniority, consistent with ability to perform the work required.

\* \* \* \* \* \*

p. 10(d) The seniority practices in effect in Toilet Article Making, Toilet Article Finishing, Power Plant, and Maintenance Departments during 1959 will be continued, and nothing in paragraphs under (a) will be construed to abrogate such practices.

\* \* \* \* \* \*

p. 10(f) Plant layoffs and re-employment shall be made in accordance with plantwide seniority, consistent with the ability to perform the work required, in the two seniority classifications listed below:

1. Male labor in all departments.

2. Finishing labor in the Toilet Article Finishing and Shipping Departments. (Also included are female labor in Sanitation, and female clerks.)

The old contract provided numerous interrelated and contingent and corollary provisions which, together with plant practices which are recognized in the contract, result in the unique system of seniority and job assignments discussed above, and while they must be borne in mind in the decision of this case, a detailed recital of them would present insuperable obstacles here of time and space.

Appendix "L" to that contract contained certain provisions of relevance:

I. p. 70 Jobs now classified as Finishing Labor Jobs will remain Finishing Labor and General Labor jobs will remain General Labor.

II.1 p. 70 Finishing Labor is defined as any job in which a woman can physically perform all the duties, such as: feeding, sorting, weighing, inspecting, packing, light machine tending, stencil cutting, or cleaning, on which a satisfactory pace may be maintained without undue strain. T. A. light machine tending will be defined as such tending duties as starting and stopping filling equipment and removing minor jams and cleaning up after minor jams. An example of this T. A. light machine tending would be the tube feeders on Dental Cream lines and the carton tenders in Toilet Articles.

II.3 p. 71 Women will be employed only on Finishing Labor jobs in the following Departments with the exception of clerical jobs:

a) Toilet Article Finishing

b) Shipping Department

c) R. & I. (Soap Warehouse)

d) Sanitation (Janitress)

The sentence just quoted above has always been interpreted to mean that "Only women will be employed on Finishing Labor jobs in the listed departments."

With Title VII of the Civil Rights Act of 1964 becoming effective July 2, 1965, Colgate was prepared to submit proposals to the Union in the scheduled negotiations for a new contract to supplant the previous one extending until October 1, 1965. The first negotiation between Colgate and the Union occurred on August 31, 1965, and at that meeting Colgate did submit to the Union proposals to eliminate, in the new contract, all distinctions and differences based upon sex. The neologism "de-sex" was used as a brief and handy verb in referring to the proposed changes from the old contract to the new contract.

The Company's proposals were presented in general terms and not in suggestions of detailed and exact amendments and there was no acceptance by the Union. On the very next day, September 1, 1965, another session of negotiations took place and on that day the Company presented to the Union a complete set of proposed changes in detail and in a prepared and exact text, to de-sex the old contract in the execution of a new one. Colgate did not at this time, or at any time during the negotiations, communicate to the Union its decision to impose a 35-pound weight lifting limit on its female employees.

Although there were discussions referring to these proposals during subsequent negotiating sessions, Colgate's proposals to de-sex the contract were not accepted by the Union until February 8, 1966, at which time the Union representatives agreed with the proposed changes, but there was no formal contract signed at that time since agreement had not been reached on wages.

When the negotiations did not result in a contract, the Union went on strike February 24, 1966, over the wage issue.

During the strike Colgate kept its doors open for work and for employees who might wish to work.

In spite of the attempt by Colgate to operate its plant during the strike, no employees who were members of the bargaining unit sought employment or undertook to perform any work available to them. Included among the employees who did not seek employment during the strike were the named plaintiffs and, in fact, all of the female employees at the plant. Instead, Colgate actually operated, although not at a normal level, by using salaried employees on production and maintenance work.

At the conclusion of the strike on April 25, 1966, a formal written contract was signed between Colgate and Local #15, and the employees in the main returned to work, including all of the named plaintiffs except five with lowest seniority who were not recalled until May 16, 1966, with that as a new seniority date, and

three who had by the terms of the labor contract lost all their seniority and who were not recalled or rehired at all.

The new contract was made retroactive with respect to pay rates from October 1, 1965, and the entire contract was given a term until October 1, 1967.

This new contract eliminates reference to men or women or to sex. That is to say, the new contract was de-sexed and Colgate began operation under it upon its execution on April 25, 1966.

The new contract, in Section 6 entitled "Seniority," repeated verbatim the excerpt from subsection (a) of the previous contract hereinabove quoted (supra p. 32) and then added this sentence:

> p. 7 * * * Should an excess of employees unable to perform available jobs within the department develop during the week these employees may be classified as Surplus Labor and may be transferred to other departments on the same shift at any time as the need may arise.

The new contract also incorporated the old Subsection (d) hereinabove quoted (supra p. 32) representing a sort of "grandfather clause" for seniority practices in certain departments, including the Toilet Article Finishing Department.

The separate seniority lists for men and women as provided in the old subparagraph (f) was completely eliminated and in its place a new subparagraph (f) was substituted as follows:

> p. 10 Plant layoffs and re-employment shall be made in accordance with plantwide seniority, consistent with the ability to perform the work required. In crewing for the week in order to avoid laying off an employee with more plant seniority than a retained employee because of inability to perform the work required, such senior employee may be temporarily placed on a job which he is capable of performing, in the opinion of the Company, in any department provided such job is filled by an employee with less plant seniority, dis-

placing such junior employee who would otherwise be scheduled on such job. In the alternative, such senior employee may be classified as Surplus Labor and may be transferred to other departments on the same shift at any time as the need may arise. Such temporary assignment(s) to another job(s) or to Surplus Labor, in order to avoid the layoff of a senior employee, will be excepted from the maintenance of rate provisions of the Agreement when the employee is transferred to another department or returned to his home department when work which he can perform becomes available.

Paragraph I of Appendix "L," as quoted (supra p. 33), was inserted unchanged in the new contract, and the two sentences of Paragraph II giving the Company the initial right to classify any new or materially changed job as either General Labor or Finishing Labor, subject to the grievance procedure upon disagreement of the Union, was also retained without change. However, the definition of Finishing Labor (which under the old contract was preserved exclusively in certain departments for women and which under the old contract provided for men only on Finishing Labor in the other departments) was completely changed and in its place the following subsection was inserted:

p. 72—II. 1. Finishing Labor (Grades 1 through 4) is defined as any light task job such as: feeding, sorting, weighing, inspecting, packing, T. A. light machine tending, stencil cutting, or cleaning, on which a satisfactory pace may be maintained without undue strain. T. A. light machine tending will be defined as such tending duties as starting and stopping filling equipment and removing minor jams and cleaning up after minor jams. An example of this T. A. light machine tending would be the tube feeders on Dental Cream lines and the carton tenders in Toilet Articles.

Thus, it is seen that under the new contract, and this is confirmed by the practice under it, Finishing Labor jobs in all departments of the plant were and are open to women. Since the end of the strike, the return to work and the signing of the new contract—April 25, 1966—the female employees have actually been accorded Finishing Labor jobs anywhere in the plant for which they indicated a preference and which their seniority commanded, and also Finishing Labor jobs for which they have not indicated a preference. Under the new contract and the present practice there is no distinction made in the selection or the method of assignment of Finishing Labor jobs on the basis of sex, i. e., of women as opposed to men or of men as opposed to women. Thus, under the new contract and at the time of trial no discrimination with respect to sex in connection with Finishing Labor jobs was prescribed by contract or practiced.

### Adoption of Standard for Maximum Weight Lifting

As indicated by the wartime contracts and the practices under them, as shown by the oral evidence at the trial, the General Labor jobs represent work which is substantially heavier, that is to say, which requires considerably more physical effort in pulling, pushing, lifting, and carrying, and in heaving and straining than that associated with the Finishing Labor jobs.

It was the traditional practice of both Colgate and the Union from the first employment of female employees at the plant in 1942 until the date of the strike, February 24, 1966, to restrict General Labor jobs to male employees and, as a sort of quid pro quo, to restrict Finishing Labor jobs in the Toilet Article Finishing Department and a few Finishing Labor jobs in three other departments to female employees. As mentioned before, this policy was temporarily changed during the war years (1943–1946) when certain General Labor jobs were rearranged, by agreement of Colgate and the Union, so as to have them "tailor made" for female performance. Other jobs

which involved lifting of twenty-five pounds or less which were formerly filled by men only were filled during the war years by women who received the same rate of pay as men on the job. It is established without contradiction that Colgate adopted and effected a limit of twenty-five pounds for lifting or carrying by female employees during this war-time emergency when they performed the emasculated General Labor jobs.

It was argued that Colgate took an indifferent attitude upon the enactment of Title VII; however, the facts disclosed that in the summer of 1965 representatives of Colgate went to Washington and attended the White House Conference on Equal Employment Opportunity on August 19 and 20, 1965, at which were present representatives of the EEOC and at which an effort was made to anticipate and discuss the problems which might arise under this novel act—Title VII—affecting virtually every employer in the United States. Representatives of Colgate also began a serious study of what to do about implementing Title VII, not only to prepare for the 1965 labor negotiations at its Jeffersonville plant and other plants in the United States, but also to meet its obligations under the Act in the day-to-day operations of its plants.

The Court finds that Colgate was concerned with the health and safety of the female employees and wanted to avoid putting them to tests or contests of strength that might be harmful, knowing that the health and protection of females has been a basic part of public policy and legislative concern in the United States. The Company was also concerned about the normal operation of its particular business and its particular enterprise at Jeffersonville, Indiana.

In consequence, various members of its managerial staff, its executive staff and its labor relations staff studied the statutes and regulations of the some twelve or thirteen states in the United States which had in effect limits on the maximum weight which women might lift or carry. It was learned that these states had by statute or regulation, prohibited the lifting of weights by women in various amounts, from a low of fifteen pounds in Utah to a high of thirty-five pounds in Michigan. It was presumed by these officials of Colgate that before imposing these weight limits, the various states had studied the effect of lifting upon females by means of their own personal and medical and scientific advice and in accordance with the expertise naturally and legally attributable to the regulatory bodies of these states charged with the enforcement of the statutes and regulations. Therefore, respect and regard were given to these state statutes and regulations as teaching and offering reasonable examples and standards for maximum weight lifting and carrying by women.

Colgate was especially interested in and influenced by the statutes and regulations of the states in which their other plants were located—namely, Berkeley, California, Kansas City, Kansas, and Jersey City, New Jersey. Special consideration was given to the standards adopted in those three states in view of the fact that there was and is no statute or regulation in Indiana fixing or prescribing weight limits for lifting or carrying by female employees.

It was proven that in the State of California there had been and was at the time of trial a statute which mentioned fifty pounds as the maximum limit for weight lifting by women, but that this limit had been reduced by the regulatory body charged with the enforcement of the statute, and by and with the advice and approval of the Attorney General of California, to a maximum limit of twenty-five pounds for lifting or carrying by female employees in that state. This standard was considered by the Colgate management in arriving at a safe and reasonable limit for weight lifting or carrying by the female employees at the Jeffersonville plant.

The evidence established that the State of Kansas had and at the time of trial had a limit of thirty pounds as the maximum weight to be lifted or carried by

females in the course of their employment. This standard was considered by the Colgate management in arriving at a safe and reasonable limit for weight lifting or carrying by the female employees at the Jeffersonville plant.

The evidence adduced at the trial shows that the State of New Jersey had and at the time of trial had a limit of twenty-five pounds as the maximum weight to be lifted by female employees in New Jersey. This standard was also considered by the Colgate management in arriving at a safe and reasonable limit for weight lifting or carrying by the female employees at the Jeffersonville plant.

A most comprehensive study was concluded in March 1964, in Geneva, under the auspices of the International Labor Organization, where experts from eleven countries met specifically for the purpose of attempting to establish a realistic criterion "On the Maximum Permissible Weight to be Carried by One Worker" (the adult male and female workers, as well as children).

It was agreed by the experts at the International Labor Organization Conference that the maximum permissible weight limits for women in industry should be fixed between thirty-three and forty-one and one-tenths pounds.

In 1965 the United States Secretary of Labor issued a bulletin containing certain recommendations with respect to the safety of lifting by female employees in industry. The Secretary adopted the thirty-three to forty-one and one-tenths pound standard, with certain qualifications including a caution that weights in this range were to be lifted by female employees only when such weights were in compact form and provided with a convenient handle and did not have to be lifted from the lowest body level to the highest body level. That is to say, employers were cautioned, in effect, to let female employees lift such weights in such form and provided with handles only from the floor to waist level or from waist level to shoulder level.

This standard was also considered by the Colgate management in maintaining a safe and reasonable limit for weight lifting by the female employees at the Jeffersonville plant.

The Colgate officials at the Company's headquarters in New York made a study of the possible impacts of Title VII and recognized that it would be illegal for industries to discriminate between their employees by virtue of sex, and that some of Colgate's labor contracts might be illegal, at least in text, under the Act. In consequence, on August 10, 1965, a letter was directed from C. O. McIntyre, Director of Employee Plans and Policies, Employee Relations Department, of Colgate's New York office to D. E. Stanberry, Plant Manager of the Company's Jeffersonville plant, reading in material part as follows:

In order to be in conformity with Title VII of the Civil Rights Act, it is felt advisable to review all hourly paid jobs to determine which jobs can generally be:

(a) Performed by women only; giving consideration to special qualifications such as manual dexterity.

(b) Performed by men only; giving consideration to local state laws and regulations relative to such items as weights handled and hours of work. It is our opinion that, subject to local laws and regulations, a woman should not be permitted to handle in excess of 35 lbs.

(c) Performed by both men and women.

From that time until some time shortly before the end of the strike on April 25, 1966, representatives of the Company continued to make analyses and studies of the various jobs in the Jeffersonville plant. In cooperation with members of management in Colgate's New York office and the local managerial personnel at Jeffersonville, a decision was reached some time shortly prior to the end of the strike that a set limit of thirty-five pounds for lifting or carrying by female employees at the Jeffersonville plant

should be established as a maximum, and then with caution to be exercised even with weights of thirty-five pounds or less if the frequency of such lifting or carrying of the lesser weights was high in number per shift or required lifting to excessive heights. This standard was adopted and carried into effect when the employees returned at the end of the strike. It was not, however, communicated to the Union or embodied in the collective bargaining agreement.

Under the new labor agreement between Colgate and the Union, as indicated, all Finishing Labor jobs throughout the plant were opened for bidding by female employees.

By application of the standard of thirty-five pounds as maximum for lifting or carrying by females, when the employees returned to work after the strike on April 25, 1966, Colgate opened to female employees two General Labor job classifications, and later, after re-study at the request of the Union, two more General Labor job classifications.

All of the jobs in Toilet Article Making Department are classified by the Company, and properly so under the evidence, as General Labor and filled exclusively by men since each of those jobs requires the handling of ingredients in heavy containers such as drums or bags weighing in excess of thirty-five pounds, and other strenuous physical effort.

The major focus of the plaintiffs' and the Union's evidence was directed toward General Labor jobs in the Toilet Article Finishing Department. It was the position of both the plaintiffs and the Union that the General Labor jobs in the Toilet Article Finishing Department could be performed by some or certain of the female employees on the pay roll who were claimed to possess extraordinary strength and stamina. Some of the named plaintiffs claimed to possess sufficient strength and stamina to permit them to perform some of the General Labor jobs in the Toilet Article Finishing Department without undue stress and strain. The Union witness, Mr.

Funkhouser, described almost every one of the General Labor jobs in the Toilet Article Finishing Department and in most instances followed his description with his opinion to the effect that the jobs could be performed by women "upon an individual basis and with proper instruction."

The testimony of this witness, however, taken together with the testimony of the Company witness, Foreman Inzer, and their respective proofs taken together were generally consistent rather than contradictory and showed that all of the General Labor jobs in the Toilet Article Finishing Department, other than the four job classifications mentioned above as having been opened to women, require the lifting or carrying of weights in excess of thirty-five pounds.

Neither the plaintiffs nor the Union adduced evidence to show that the General Labor jobs in other departments of the plant involved the lifting or carrying of any particular weight or weights more or less than thirty-five pounds. On the other hand, it was the testimony of Colgate's witnesses that the management had made a preliminary study of these General Labor jobs in other departments and had reached at least the preliminary conclusion that all of these General Labor jobs in other departments did require the lifting of weights in excess of thirty-five pounds. Female employees did not have sufficient departmental seniority in those other departments to make it likely that they could secure such jobs by means of preference sheets and therefore very few General Labor jobs in other departments of the plant had been listed on the women's choice sheets. It was not disclosed whether in any instance any female had sufficient departmental seniority, compared with male employees of many years service, to permit such females seeking such jobs to secure them.

It is the Court's finding, under the evidence, that it was and is so impractical as to be pragmatically impossible for Colgate to operate its plant under the highly refined, bizarre and ex-

traordinarily complex system of seniority and job assignment in effect at the plant without establishing general norms and standards of effort in terms of maximum weight to be lifted or carried by women in general who might seek employment at the plant and by the female employees of the plant.

■ It is the finding of the Court that it was not and is not practical or pragmatically possible for Colgate, in the operation of its plant, to assess the physical abilities and capabilities of each female who might seek a particular job, as a unique individual with a strength and a stamina below average or above average or to consider special female individuals as uniquely qualified among women in general as suited to the performance of certain General Labor jobs which she might seek by means of her preference sheet.

The peculiar system in effect at Colgate's Jeffersonville plant has been in existence for many years and was not adopted in order to avoid the impact of the Act.

The Court listened carefully throughout the long weeks of trial for any hint that Colgate had purposely set about to discriminate between male employees and female employees in the plant with any evil or intentional motivation for monetary gain and there was no such evidence. On the contrary, the evidence shows that Colgate's chief interest in fixing a weight limit for women was in the safety and health of its female employees, even though the safeguards established might also have been and will be useful and meaningful in promoting efficiency in the operation of the plant. The safety motive is not inconsistent with, but in fact is complementary and compatible with, the necessity for efficient operation.

■ The Court finds that the necessity of a weight limit for lifting or carrying by women at Colgate's Jeffersonville plant is confirmed and the par-

ticular weight limit of thirty-five pounds is found reasonable and proper in the circumstances of this case.

The evidence discloses that the gradual and lengthy development of Colgate's peculiar system of seniority and job assignment came about by the pressures and compromises of the collective bargaining process as used by the Union and the Company in contract negotiations over the years. Therefore, the Union must be considered as at least equally responsible with the Company for this highly refined evolutionary result and consequently the Union must be held partially responsible for the circumstances as they exist.

It is further the view of the Court that if each individual employee had to be considered on the basis of his or her own personal and unique physical capabilities, interminable dissension would ensue which, under the peculiar system now a part of the normal operation of Colgate's plant, would make it utterly impractical and virtually impossible to achieve any reasonable operation of the plant.

*Facts Relating to Claims against the Union*

Under the agreements in effect at the Jeffersonville plant, as under most collective bargaining agreements, the Union does not administer the contract. The Union does not hire, fire, lay off or recall from layoff, or assign employees to jobs. These are management's responsibilities. Management is obliged to perform its responsibilities in accordance with the law and in accordance with the collective bargaining agreement. The Union's sole right, under the collective bargaining agreement, is to process a grievance claiming that the Company has violated the agreement. Its right under the law is to file a complaint, or assist employees in doing so, that the Company has violated the law.

■ When some of the plaintiffs, after the effective date of the Civil Rights Act of 1964, complained to the Union because of their layoff while male

employees of lower plant seniority remained at work, the Union informed them that their grievance did not fall within the purview of the collective bargaining agreement. As was stated earlier, that agreement, which was negotiated in 1963, provided for separate male and female seniority. Although this provision may have been rendered unlawful, and hence ineffective, because of the coming into effect of Title VII of the Civil Rights Act of 1964, there was no alternative contractual provision prohibiting such layoffs and the layoffs of the complaining female employees were therefore not in violation of the contract. The Union, through its attorney, so advised them. It then, through its attorney, prepared and filed charges on behalf of these charging employees with the Equal Employment Opportunity Commission, claiming that the layoffs were unlawful under Title VII. Those charges eventually matured into this lawsuit. Under those circumstances, there is no factual basis for holding the Union liable to Colgate, either by way of contribution or indemnity, for the damage suffered by these female employees.

▮ Even if there were some technical basis for imposing liability against the Union, an award of back pay under the Act is within the sound discretion of the Court. The Union has, in this suit, been most assiduous in seeking to protect the rights of the plaintiffs and to secure relief for them. Although named as a defendant by the plaintiffs, it has been aligned with them and against the defendant Colgate. Under these circumstances, a judgment requiring the Union to recompense the plaintiffs, or to indemnify Colgate for the very actions which the Union has protested, would not be warranted.

### Facts Relating to the Claims against Colgate

In the original complaint the plaintiffs make nineteen allegations against defendant Colgate and the Union. The amended and supplemental complaint and the first intervening complaint repeat substantially the same allegations. Although these allegations are not specifically related in the complaints to the two distinct contract periods which have occurred since the effective date of the Civil Rights Act of 1964, the Court will bifurcate its findings into the separate contract periods for purposes of clarity. The Court finds that the first period covered by the allegations encompasses the time between the effective date of the Civil Rights Act of 1964—July 2, 1965—April 25, 1966, when the strike ended and a new collective bargaining agreement was signed. During this first period of time the 1963 agreement was in effect between Colgate and the Union, having been extended from day to day pending settlement of a new contract. The second period of time pertinent to the allegations of the complaints is on and after April 25, 1966.

Colgate and the Union admitted, and the Court finds for both periods of time in question, that the named plaintiffs in the original complaint and the named plaintiffs in the first intervening complaint, with the exception of Geneva Whittinghill, Roberta LaPaille, Mary Stumler and Virginia Franklin, were employees of the defendant Colgate at its Jeffersonville, Indiana, plant and were last employed on Finishing Labor jobs when the complaint and the intervening complaint, respectively, were filed. The Court finds that Virginia Franklin and Roberta LaPaille were rehired by Colgate on May 16, 1966, after layoffs of over one year. The Court finds from the evidence that Mary Stumler was rehired by the Company some time after the intervening complaint was filed.

The complaints allege, in substance, that defendant Colgate discriminated against the plaintiffs and members of the class with respect to compensation, terms, conditions and privileges of employment because of their sex, deprived female employees of employment opportunities because of their sex alone, classified and segregated females discriminatorily because of their sex and limited females to

Finishing Labor jobs even though they were qualified to perform other jobs at the plant. The Court finds these allegations not true, with the one exception set out below.

 In that period under the old contract during which the Act was in effect, that is, the period from July 2, 1965, to April 25, 1966, defendant Colgate had two layoffs. The first layoff was on November 12, 1965, and the second was on November 19, 1965. In making these layoffs Colgate used separate male and female seniority lists. The Court finds that the use of seniority lists segregated by sex resulted in certain female plaintiffs and intervening plaintiffs being laid off from employment while males with less plant seniority were retained on the active pay roll. The Court finds that the layoffs of November 12, 1965, and November 19, 1965, resulted in discrimination in violation of Title VII of the Civil Rights Act of 1964 against the female employees laid off who had greater plant seniority than those males with lesser plant seniority who were retained. The Court further finds that the discrimination against females effected by these layoffs terminated on February 24, 1966, when defendant Union and all its members, including plaintiffs, struck Colgate.

The sex discrimination effected by the use of separate male and female seniority lists on November 12 and 19, 1965, is the sole and singular violation of the Civil Rights Act of 1964, the Court finds in this case after full consideration of the pleadings, the evidence, and arguments and briefs of the parties.

The Court finds that the layoffs in April 1965 were not discriminatory since the Civil Rights Act of 1964 was not in effect when these layoffs occurred.

The Court finds that defendant Colgate has not intentionally engaged in and is not intentionally engaging in any unlawful employment practice charged in the original complaint or in any of the other complaints which requires any injunctive relief.

The Court finds from the evidence that seven of the original thirteen plaintiffs and seven of the nineteen intervening plaintiffs filed charges of sex discrimination with the EEOC. These are original plaintiffs Lena Moore, Pauline Hambough, Anna D. Huff, Georgianna Sellers, Mary E. Stum, Thelma Bowe and Anna H. Casey, and intervening plaintiffs Isabelle Jackson, Delores Sturgeon Bartle, Dorothy Young, Mary Blakely, Roberta LaPaille, Verner Boothe, and Geneva Whittinghill. Of these, one original plaintiff, Pauline Hambough, and one intervening plaintiff, Roberta LaPaille, were laid off before the effective date of the Act and their charges were not filed until May 18, 1966, more than ninety days after any unlawful employment practice, which might have been the basis for a charge, occurred. The other original plaintiffs, Rita Kirchgessner, Lena Bell, Stella Muncy, Murel B. Bussey, Iva Spriggs, and Geneva Wells, and the other intervening plaintiffs, Irene Whitman, Margie Cochran, Mona Briscoe, Irene Collier, Dorothy Jakubowski, Geraldine Pangburn, Mary Stumler, Virginia Franklin, Eva Hall, Shirley Hall, Vadna Helton, and Alice Shroyer did not file charges of sex discrimination with the EEOC.

Attached to the amended and supplemental complaint was a letter to plaintiff Georgianna Sellers advising her of her right to bring this court action and a copy of a "Decision" of the EEOC, directed to "Verner Boothe Et Al" and bearing a reference to Case Numbers 5–11–2913 through 2926, finding reasonable cause to believe that the charges of sex discrimination by Colgate were true.

On the basis of these exhibits attached to the amended and supplemental complaint, of those who filed suit herein the Court finds that plaintiffs Thelma Bowe, Lena Moore, Anna D. Huff, Georgianna Sellers, Mary E. Stum, Anna H. Casey, named in the original complaint, and Isabelle Jackson, Delores Sturgeon Bartle, Dorothy Young, Mary Blakely, Verner Boothe, and Geneva Whittinghill named

in the first intervening complaint were advised by the EEOC of their right to bring suit in this court on their sex discrimination complaints.

The Court finds that only these twelve original and intervening plaintiffs, that is, those who were laid off on November 12 or 19, 1965, who filed timely charges with the EEOC and who were advised by the EEOC of their right to bring suit, are entitled to recover in this action. The amounts which these plaintiffs will be allowed to recover and the manner in which such amounts were determined are set out in the Court's Conclusions of Law and the Appendix hereof.

After trial of this action commenced, the defendant Union filed a cross-claim against Colgate. In substance, the allegations of the cross-complaint charge that Colgate discriminated against female employees as to job opportunities and preference at the Jeffersonville plant; that the Company refused to discuss a number of grievances with the Union concerning alleged sex discrimination against female employees; and that Colgate segregated and classified its employees according to sex and discriminated against female employees in its hiring practices, wage scale, layoff and re-employment. These allegations are found to be without merit.

## CONCLUSIONS OF LAW

The Court has jurisdiction of this action and the parties under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f).

Colgate was an "employer" and the defendant Union was a "labor organization" within the meaning of Title VII of the Civil Rights Act of 1964.

The female employees of defendant Colgate employed at the Jeffersonville plant are so numerous as to make it impractical to bring them all before this Court in this action and the plaintiffs are such persons as will fairly insure the adequate representation of all female employees at the plant in this class action. The character of the rights sought to be enforced on behalf of the employees as a class is joint and common as relates to injunctive relief and separate and several as relates to money damages and reinstatement. See Hall v. Werthan Bag Corp., 251 F.Supp. 184 (M.D.Tenn.1966).

The congressional debates on the sex factor of the Act were reviewed and found to be of little interpretative value. The debates indicate that Congress reserved to the employer discretionary prerogatives in hiring or assigning personnel for particular functions. Likewise, in this context, there is little in the debates in either the House or the Senate from which to draw any sure inferences. It appears, however, that the Act reaches into the employment office and even before and beyond employment. The text of the Act confirms this in that § 703(e), 42 U.S.C. § 2000e–2(e), makes it unlawful for an employer "to hire" employees on the basis of sex (except where there is an "occupational qualification reasonably necessary to the normal operation of that particular business or enterprise").

The internal content of the Act discloses that unlimited discrimination on the basis of sex was denied. The internal content of the Act also discloses that *all* discretion or discrimination was not removed from the employer's prerogatives. Section 704(b), 42 U.S.C. § 2000e–3(b), specifically permits "discrimination" based on sex when it is a bona fide occupational qualification.

The Act shows first that "notwithstanding any other provision of this Title," it shall not be unlawful for an employer to hire or not hire or to limit, segregate or classify employees on the basis of sex in those cases in which sex is an "occupational qualification *reasonably* necessary to the *normal* operation of that *particular* business or enterprise." (Emphasis added.)

Thus, there is left between the absolute prohibition of § 703(a), 42 U.S. C. § 2000e–2(a), and the exception of § 703(e) an area in which the employer has

discretionary prerogatives within which he, in good faith ("bona fide") may determine that a sex qualification is "reasonably" necessary to the "normal" operation of his "particular" business.

This exception is couched in extremely broad terms since it leaves to the employer's bona fide judgment whether selection or deployment of employees on the basis of sex is reasonably necessary to the normal operation of his particular business or enterprise. All discretion is not allowed. All discretion is not denied.

Some managerial leeway is allowed by virtue of the text of § 708, 42 U.S.C. § 2000e–7, which preserves management's responsibilities to comply with the state laws (relating to rates, hours, conditions and special occupations) for the protection of women to the extent that such state laws do not require or permit unlawful practices under the Act. The EEOC has published certain guidelines in what it calls "an effort to temper the bare language of the statute with common sense and a sympathetic understanding of the position and needs of women workers." 30 Fed.Reg. 14926 (1965). (In the course of this litigation the Court has many times indicated the necessity, in the same way, of a common sense approach to the possible impacts of this novel Act.)

The EEOC itself says in its guidelines "the commission cannot assume that Congress intended to strike down such (state) legislation." 30 Fed.Reg. 14926 (1965).

 The Commission cites as examples of state restrictions to be honored, those on lifting weights (except where the limits are set at such unreasonably low levels as could not endanger women). It appears certain then that among management's other discretionary prerogatives is that of selecting some weight or range of weights, the lifting of which women will not be employed or assigned to perform.

This is intended only as one example of management's "discretionary prerogatives." (Others, for this particular defendant, might well relate to hazards encountered by female clothing, to extensive vertical and horizontal reaches, about which the female employees at Colgate have complained, to heat and cold and allergies, to which males and females in a particular plant may have significantly disproportionate tolerances, and there may well be many other areas for bona fide judgment of management.)

The sex provisions of the Act were adopted without hearings on the numerous problems and without any studies of them and without adequate information, and provide no standards or guides with respect to sex between the absolutes of no discretion and all discretion.

A scholarly and well-documented study of the Act and its possible impacts mentions several possible standards for interpretation in this vague area.[3] One possible standard suggested is that of a test by "necessity" under which the occupational qualification might be applied only where it is confined in the strictest sense to the type of job that can be performed by one sex only, such as restroom attendants, models for women's clothes and so forth. This study does not recommend this test. In addition, it must be remembered that the Act does not couch the exceptions in terms of a "necessity" but instead in terms of a "bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise."

Consequently, it is easily seen that the test of strict necessity does not comport with the Act.

Another suggested standard is that of the "traditional roles" test. However, if women may be denied jobs traditionally assigned to men, completely aside from the respective qualifications and limitations of the two sexes, then the Act will be ineffectual. On that account, this test

---

3. Note, Classification on the Basis of Sex and the 1964 Civil Rights Act, 50 Iowa L.Rev. 778 (1965).

cannot be adopted. The study suggests as a preferable test, that applied in decisions based upon the equal protection clause of the Fourteenth Amendment. This study states:

"The third, and apparently preferable, approach in applying the sex exception of the act is to utilize the reasoning provided in decisions based upon the equal protection clause of the fourteenth amendment.[102] In this manner

102. The test for equal protection is generally stated as follows: "Is the classification contained in the statute arbitrary * * * or is it based upon a reasonable distinction having a fair and substantial relation to the object of the legislation * * *?" State v. Hunter, 208 Or. 282, 286, 300 P.2d 455, 457 (1956). See text accompanying notes 36–38 supra.
 See State v. Heitman, 105 Kan. 139, 181 Pac. 630, [8 A.L.R. 848] (1919), which recognized the existence of a "feminine type radically different from the masculine type." Id. at 147, 181 Pac. at 634.
 "[T]he fact that in many instances individuals of one sex are in general better fitted than those of the other sex for a given occupation or business is one of such common knowledge and observation that the Legislature may properly recognize it in enacting regulations therefor." In the Matter of Carragher, 149 Iowa 225, 229–30, 128 N.W. 352, 354 [31 L.R.A.,N.S., 321] (1910).

the act would extend the fourteenth amendment concepts to private employers and make restrictions on employers somewhat congruent with restrictions on state legislators. This analogy is rough because a rational legislative classification made pursuant to the police power may not be rational as an employment qualification. The test may be stricter for employers who may not seek to achieve goals comparable to those which a state legislature may seek to achieve under the police power. Still, the basic premise would be that employers may discriminate, but they, must do so rationally. A loose analogy may be drawn between differences in the sexes that a rational legislator could consider prevalent and those which an employer could also find to

exist. This approach would require determining whether the discrimination of the employer is rationally related to an end which he has a right to achieve—production, profit, or business reputation. It has the advantage of providing a frame of reference for the courts through the use of concepts found in previously existing case law where the equal protection clause has been properly applied.[103] It also

103. Ibid.

strikes a balance between construing the act as a mandate for equality—which, because of the exception, it clearly is not—and rendering it totally ineffective. Thus, where a woman applies for a job as a barber, the employer can establish his case merely by showing that hiring her would cause him to lose a significant number of patrons. Similarly, an employer might rationally refuse to hire a woman night club manager on the ground that women are less capable than men at maintaining 'peace and good order' in establishments selling liquor.[104] By construing the act in

104. Cf. Anderson v. City of St. Paul, 226 Minn. 186, 197, 32 N.W.2d 538, 544 (1948).

terms of equal protection notions, the courts should be able to aid the cause of equal employment for women without an unnecessarily harsh effect on employers."

If the test of reasonableness as developed in the many decisions interpreting the equal protection clause of the Constitution is reliable enough to guide legislators, then the same standard ought to afford some guidelines for business.

■ Sex, under the Civil Rights Act of 1964, is not to be equated with race. The congressional debates appear to make it clear that the Senators and Congressmen thought sex and race were not to be equated in the legislature.

Congressman Celler remarked:

"What is more, even conceding that some degree of discrimination against

women obtains in the area of employment, it is contrary to the situation with respect to civil rights for Negroes." 110 Cong.Rec. 2578.

He quoted a letter from the U. S. Department of Labor to the same effect:

> "But discrimination based on sex, the Commission believes, involves problems sufficiently different from discrimination based on the other factors listed to make separate treatment preferable." 110 Cong.Rec. 2577.

The Iowa Law Review Note, at page 797, states:

> " * * * Clearly the sex-discrimination problem is a unique area, requiring an approach which considers this factor. *Unlike the race area, there is general agreement that there are significant and meaningful biological and psychological differences between the sexes.* Also *unlike the racial problem,* there is no clear congressional policy such as can be found in the legislative history of the thirteenth, fourteenth, and fifteenth amendments. The only recognition given to the unique nature of the sex problem is the allowance in the act for a 'bona fide occupational qualification' *based on sex,* while discrimination *between races* is *totally prohibited.* It is suggested that the 'equal protection test' would give recognition to these unique problems of sex discrimination by providing a case-by-case basis for a determination of what is rational." (Emphasis added.)

Thus, it is seen that there is significant internal evidence contained in the Act itself that it did not equate these discriminations. The · prohibition against sexual discrimination as noted, § 703(e), 42 U.S.C. § 2000e–2(e), is only conditionally limited, whereas discrimination between the races is totally prohibited. § 703(a), 42 U.S.C. § 2000e–2(a).

In fact, it may be of some significance that the word "color" which appears in the total prohibition of § 703(a) is deliberately omitted from the exception contained in § 703(e) relating not only to sex but also to religion and national origin.

Thus, it is established by such little debate as there is relating to this inquiry and by literature on the subject and also by the Act itself that there is created a specific and notable difference in the treatment of sexual discrimination and the treatment of racial discrimination.

 The Act permits classification according to sex generically. Studying first the congressional debates, there are a few comments which perhaps throw some light on what the legislators intended. Congresswoman Green spoke of "the discrimination against the female of the species," a significantly generic term.

Mrs. Green further commented:

> "Because of biological differences between men and women, there are different problems which will arise in regard to employment. These should be carefuly considered by the Committee. There will be new problems for business, for managers, for industrial concerns. These should be taken into consideration before any vote is made in favor of the amendment without any hearing at all on the legislation." 110 Cong.Rec. 2584.

Nothing has been cited to the Court on this question in the literature except that contained in the Iowa Law Review, quoted from above, suggesting the use of the same test and approach "in applying the sex exception of the Act" as that used in the decisions based upon the equal protection clause of the fourteenth amendment. It is suggested: "A loose analogy may be drawn between differences in the sexes that a rational legislature could consider prevalent and those which an employer could also find to exist." 50 Iowa L.Rev. 778, 795.

This commentary continues:

> "There are, of course, a limited number of clear cases where, by any possible test, there is a built-in sex requirement to which the exception should apply. This, for example, is true where state protective legislation, assuming

its continued validity, prohibits women from lifting objects of more than a specified weight or from working in certain capacities during late-evening hours. If the job applied for requires this type of activity, the prospective employee, although qualified in every other respect, may be objected to because sex becomes an occupational qualification." Id. at 796.

There is no language in the Act itself decisive on this question but it is noteworthy that sex (along with religion and national origin) is treated entirely separately from color and in generic terms, not individual terms. Not only is sexual discrimination permissible when "reasonably necessary to the normal operation of that particular business or enterprise," but the Act specifically authorizes an employer in a notice or advertisement for employees to show "a preference, limitation, specification, or discrimination" based on sex as a bona fide occupational qualification. § 704(b), 42 U.S.C. § 2000e–3(b).

There is one other item in the Act which suggests it intended to deal with the generic concept of the sexes.

The Act specifically preserves the state laws regulating employment of women. Nothing else appears to have been in the mind of the legislators when they passed § 708, 42 U.S.C. § 2000e–7.

The EEOC in its own discussion of sex as a bona fide occupational qualification, had this to say:

"(b) The Commission does not believe that Congress intended to disturb such laws and regulations which are intended to, and have the effect of, protecting women against exploitation and hazard. Accordingly, the Commission will consider qualifications set by such state laws or regulations to be bona fide occupational qualifications and thus not in conflict with Title VII. However, in cases where the clear effect of a law in current circumstances is not to protect women but to subject them to discrimination the law will not be considered a justification for discrimination.

So, for example, restrictions on lifting weights will be honored except where the limit is set at an unreasonably low level which could not endanger women.

"(c) An employer, accordingly, will not be considered to be engaged in an unlawful employment practice when he refuses to employ a woman in a job in which women are legally prohibited from being employed or which involves duties which women may not legally be permitted to perform because of hazards reasonably to be apprehended from such employment." CCH Empl. Prac.Guide 7312.

It is therefore to be taken that the Commission thought that, at least in the area occupied by state restrictions, selection or discrimination based on sex generally was and is permissible.

Perhaps stereotyped characterizations of the sexes, based upon their traditional roles, are not to be recognized in respect to mentality, taste, talent or tactile ability but "significant and meaningful biological and psychological differences between the sexes," 50 Iowa L.Rev. 797, especially in connection with physical demands, are to be considered valid bases for choice between women as a class or group and men as a class or group.

From this rationale, it may be and is concluded:

The debates in the Congress and the internal evidence of the Act itself as passed by Congress, show definitely and unequivocally that in the area between unlimited discrimination by an employer and absolute prohibition of any discrimination by an employer, there is an area for an employer's "discretionary prerogatives" in his bona fide judgment of "occupational qualification reasonably necessary to the normal operation of that particular business or enterprise."

Sexual discrimination cannot be equated with racial discrimination "because of the biological difference between men and women."

■ There are areas in interpretation and enforcement of the Act wherein generic classification of the sexes must be recognized not only as specifically permitted by the Act but as a practical necessity under the "general agreement that there are significant and meaningful biological and psychological differences between the sexes." In this area are those "restrictions on lifting weights" such as those that "will be honored" by the EEOC itself. Generic classification between the sexes must be permitted on the basis of general and generally recognized and basic differences in the physical characteristics, abilities, capacities, restrictions and limitations of the respective sexes. In short, and perhaps in oversimplification, traditional roles and stereotyped characteristics of taste or talent or emotions or tactile facility and the like cannot be made the basis for generic classification but generally recognized physical capabilities and physical limitations of the sexes may be made the basis for occupational qualification in generic terms.

The Court therefore concludes as a matter of law under the circumstances of this case that restrictions and limits on the weights that may be lifted by female employees may be imposed and enforced under the terms of Title VII of the Civil Rights Act of 1964 by Colgate as an employer, as a "bona fide occupational qualification reasonably necessary to the normal operation of that [employer's] particular business or enterprise."

■ As shown by the facts, Colgate considered the recommendations of various states and the International Labor Congress and the United States Secretary of Labor in fixing and maintaining, in the classification of jobs open or closed to women in general and to female employees of Colgate, a limit of thirty-five pounds of maximum weight which they might lift or carry. The weight limit as selected as a standard by Colgate was among the highest mentioned by any of these various authorities and appears from the evidence to be the highest limit fixed by any state. In view of the evidence and circumstances of this case, it is the Court's ruling that as a matter of law it was legal and proper for Colgate to fix such thirty-five pound limit and it is hereby approved and confirmed.

What has been said thus far as conclusions of law applies only to Colgate's acts and practices under its new contract with the Union signed and effective on April 25, 1966. The Court has found as a fact that there has been and is no discrimination by Colgate against females after April 25, 1966, the date of execution of the new labor agreement.

It is the Court's conclusion that the layoffs at Colgate's Jeffersonville plant of female employees on November 12, 1965, and November 19, 1965, did not comply with the requirements of Title VII of the Civil Rights Act of 1964. However, it is also the Court's conclusion that the filing of a charge with the EEOC within ninety days of the alleged illegal employment practice and the filing of this action within thirty days after notification of inability to secure voluntary compliance (certificate of probable cause) by the EEOC were prerequisites to the maintenance of this action. Only twelve of the named plaintiffs filed timely charges with the EEOC and filed a complaint in this action within thirty days after the notice of probable cause from the EEOC.

Consequently, only the following twelve Charging Plaintiffs are entitled to recover damages in this action: Bowe, Jackson, Sellers, Moore, Casey, Huff, Stum, Bartle, Boothe, Blakely, Young, and Whittinghill.

■ These twelve plaintiffs did not fix or attempt to establish what jobs were actually operated for each or any of the weeks they were laid off, nor what jobs were filled or performed by men younger in seniority during each or any of those weeks, nor what women with more seniority than these twelve plaintiffs would not have exerted their superior seniority to secure the jobs if they had been opened to women, nor with any mathematical accuracy what wages or other benefits to

which they might have been entitled had they been opened to women, nor with any mathematical accuracy what wages or other benefits to which they might have been entitled had they been maintained in employment during that layoff. Nevertheless, it is the Court's view and decision that the twelve named plaintiffs are entitled to receive the minimum rate of pay which they would have made had they worked during the period when they were laid off and were entitled to and available for work, and the equivalent in money of the vacations for which such work during such period would have made them eligible, and a Christmas bonus upon the same basis as that received by other employees of the status they would have had if they had worked during the layoff. These figures were not proven by the plaintiffs but they may be calculated as a mere matter of arithmetic. The schedule or digest prepared and furnished to the Court by Colgate and set forth in the Appendix hereof may be used as the basis for a judgment.

The Court has discretion under the terms of the Act of 1964 to allow back wages in whole or in part. Under the general equities disclosed by all of the proof, no interest on the amount awarded is to be allowed or paid.

■ It was the evidence of the plaintiffs who testified that they received $38.00 per week as unemployment compensation benefits from the Indiana Employment Security Division and the benefits in such amount per week for each week of the layoff during which those benefits were received shall be credited on the judgment. However, the digest previously mentioned taken from Colgate's records indicates that the plaintiffs were in error and they, with few exceptions, actually received only $36.00 per week. Since it is in favor of the plaintiffs, this latter figure is accepted by the Court as true and correct.

There are twenty Non-Charging Plaintiffs, eight of whom were laid off April 2, 1965, and twelve of whom were laid off November 12th or 19th, 1965. Of the eight laid off April 2, 1965, five were recalled by Colgate on May 16, 1966, but three lost their seniority and recall rights and have not been recalled. (See Chart, p. 27.) Two Charging Plaintiffs, LaPaille and Hambaugh, are classed as Non-Charging Plaintiffs because their charges to the EEOC were not filed until some time after May 18, 1966, and they had been laid off on April 2, 1965, before the effective date of the Act. Since the Court has heretofore found that the filing of a timely charge of sex discrimination with the EEOC, and receipt from the EEOC of a certificate of probable cause, are prerequisites to a right to maintain a cause of action in this Court for violation of Title VII of the Civil Rights Act of 1964, the claims filed in this action by the twenty Non-Charging Plaintiffs are held to be without merit or legal validity and they are denied in toto and the complaints are dismissed as to those plaintiffs.

As earlier stated, on September 9, 1966, the Court entered an order requiring each of the plaintiffs named and those other female employees of Colgate represented in the class on behalf of whom this action was brought, to make an election as to whether they would present their claims against Colgate in this action or whether they would pursue their rights under the grievance or arbitration machinery of the old contract. That order specified that the election must be and could be made only by filing or failing to file a disclaimer in this action by those plaintiffs. Their Union representatives were in court, their attorneys were in court, and many of the plaintiffs themselves were in court; therefore, notice of this order of election is conclusively presumed to have been brought home to them. Said order also enjoined each female employee who did not file a disclaimer of interest in this action from proceeding under the grievance and arbitration provisions of the labor contract.

It was and is the Court's view and conclusion that the plaintiffs, whether named or in the class, should not and may not

have two different opportunities in two different appropriate forums for presentation and litigation of their claims. It would be inequitable and unconscionable to subject the defendant Colgate to two series of extensive litigation, one series in this Court and then another series under the labor contract. Therefore, all claims by all plaintiffs named and all in the class are hereby adjudicated in full. The claims of the twelve named and Charging Plaintiffs as hereinabove stated are allowed in the sums as calculated as shown in the digest in the Appendix. The claims of all other plaintiffs named and unnamed herein are not entitled to recognition and they are denied and barred from presenting, pursuing or attempting to litigate under the grievance and arbitration provisions of the labor contract or in any other forum their claims arising out of the alleged discrimination against them by Colgate before and during the pendency of this case in this court. But such claims as may arise after the entry of judgment in this court are not barred.

Separately and with respect to those five named plaintiffs laid off by Colgate on April 2, 1965, who were still away from work through the November layoff and not rehired until May 16, 1966, and then with a new seniority date as of that date, it is found that the Act does not afford them any relief either with respect to wages, vacations, bonuses, or seniority (connected seniority) and they shall take no recovery or relief of any kind herein.

There were three Non-Charging Plaintiffs, Shirley Hall, Helton and Schroyer, who were laid off on April 2, 1965, and have not been recalled at all because, under the terms of the labor agreement, their seniority and their recall rights were entirely lost. It is the conclusion of the Court that Colgate's action in this regard was in accord with the contract and was not discriminatory in any way and that these plaintiffs are not entitled to any relief of any kind on any account.

Since the Court has found as a fact that Colgate has not discriminated against its female employees since April 25, 1966, and since the Court has made a conclusion of law that the determination of a weight limit of thirty-five pounds as a maximum of lifting or carrying by female employees was legal and proper, and that Colgate, in the meaning and sense of the Act, thus imposed a bona fide occupational qualification reasonably necessary to the normal operation of its particular business or enterprise at Jeffersonville, Indiana, the Court concludes no injunction is needed or appropriate here and none will be issued.

The class action, in view of the evidence in this proceeding, was appropriate only to injunctive relief, Hall v. Werthan Bag Corp., 251 F.Supp. 184 (M.D.Tenn.1966); however, none is merited or needed or will be granted. Therefore, as a class action this cause should be, and the same is, dismissed.

The cross-claim of the defendant, Colgate, against the defendant Union and the cross-claim of the defendant Union against the defendant Colgate are found not to have legal merit and must be dismissed and the judgment shall so state.

Plaintiffs' attorney, David L. Gittleman, is allowed a fee of Eleven Thousand Dollars ($11,000.00), and Daniel B. Burke, Jr., One Thousand Five Hundred Dollars ($1,500.00) to be paid by defendant, Colgate.

Upon the submission of an appropriate bill of costs the plaintiffs or their counsel shall have and recover of and from the defendant Colgate their allowable costs necessarily laid out and expended for the preparation and trial of this case.

The defendants Colgate and the Union shall each bear its own costs.

## APPENDIX

## BACK PAY — FEMALE EMPLOYEES

| Employee | No. Wks. | (A) Wages* | (B) 1966 Vac.** Eligibility 4 Wks. | (C) 1965 Christmas Addt'l Wks.Pay | Totals A Plus B Plus C | (D) Unemp. Comp. Received Wks. @ $ = Total | A Plus B Plus C Minus D |
|---|---|---|---|---|---|---|---|
| T. Bowe | 13-3/7 | 1395.36 | 415.20 | 102.60 | 1913.16 | 14 @ $36 = 504 | 1409.16 |
| I. Jackson | 14-3/7 | 1497.96 | 415.20 | 102.60 | 2015.76 | 14 @ 36 = 504 | 1511.76 |
| G. Sellers | 14-3/7 | 1497.96 | 415.20 | 102.60 | 2015.76 | 15 @ 36 = 540 | 1475.76 |
| L. Moore | 14-3/7 | 1497.96 | 415.20 | 102.60 | 2015.76 | 14 @ 36 = 504 | 1511.76 |
| A. Casey | 14-3/7 | 1497.96 | 415.20 | 102.60 | 2015.76 | 14 @ 36 = 504 | 1511.76 |
| A. Huff | 14-3/7 | 1497.96 | 415.20 | 102.60 | 2015.76 | 14 @ 36 = 504 | 1511.76 |
| J. Stum | 14-3/7 | 1497.96 | 415.20 | 102.60 | 2015.76 | 15 @ 36 = 540 | 1475.76 |
| D. Bartle | 14-3/7 | 1497.96 | 415.20 | 102.60 | 2015.76 | 13 @ 36 = 468 | 1547.76 |
| V. Boothe | 14-3/7 | 1497.96 | 415.20 | 102.60 | 2015.76 | 12 @ 36; 1 @ 32 = 464 | 1551.76 |
| M. Blakely | 14-3/7 | 1497.96 | 415.20 | 102.60 | 2015.76 | 14 @ 36; 1 @ 28**** = 532 | 1483.76 |
| G. Whittinghill | 1 | 102.60 | Not eligible | Not eligible | 102.60 | 1 @ 36 = 36 | 66.60 |
| D. Young**** | 14-3/7 | 1497.96 | 415.20 | Not eligible | 1913.16 | 14 @ 36; 1 @ 20 = 524 | 1389.16 |
| | | | | | | TOTAL | $16446.76 |

\* Grade #2 on October 1, 1965—$2.565/hr.
$2.565 × 40—$102.60/week.
$2.565 × 8— 20.52/day.

\*\* Grade #2 upon return 4/25/66—$2.595

\*\*\* Unemployment Compensation received during 1966 vacation shutdown.

\*\*\*\* Since the trial and following preparation of this memorandum of decision, it has come to the Court's attention that plaintiff Young may not be entitled to the recovery here scheduled. The record of these proceedings will, therefore, remain open for ascertainment of her entitlement to recovery. No judgment in her behalf will be entered until her right to recovery is further established.

## SUPPLEMENTAL FINDING OF FACT CONCERNING DOROTHY YOUNG and RULINGS ON OBJECTIONS TO BILLS OF COSTS

Pursuant to the Court's order in its memorandum decision of June 30, 1967, the record in these proceedings was ordered to remain open for the purpose of ascertaining the right of recovery on the part of Dorothy Young, one of the plaintiffs in the first intervening complaint. She did not appear to testify at the trial. See Appendix footnote. By agreement of counsel her deposition and the deposition of Donald D. Vascimini, Supervisor of Employee Relations for the Colgate Company were taken on July 13, 1967.

After reading the depositions and the arguments of counsel the Court

finds that Dorothy Young is not entitled to recover the full amount called for in the schedule appearing in the Appendix to the Court's memorandum decision entered June 30, 1967, however, she is entitled to recover in the amount of $883.20. This sum is based upon the Court's finding that both before and after the company lay-off, Dorothy Young had a record of absenteeism of approximately 25% (Young Dep. p. 12, Vascimini Dep. p. 4).

The following formula was used to arrive at the amount of the recovery:

| Employee | Wks. | (A) Wages | (B) 1966 Va. Eligibility 4 Wks. | (C) 1965 Christmas Add'l Wks. Pay | Totals A Plus B Plus C | Unemp. Comp. Rec'd Wks. at $ | (D) Total | A Plus B Plus C Minus D |
|---|---|---|---|---|---|---|---|---|
| D. Young | 11–3/7 @ 102.60 /week (3/4ths thereof) | 879.43 | 415.20 | –0– | 1,294.63 | 11–3/7 @ 36.00 | 411.43 | 883.20 |

Contrary to the present contention of the defendant Colgate that there is no showing that Dorothy Young ever received a certificate of probable cause to bring this suit, the Court in its memorandum decision of June 30, 1967, found that she was among those plaintiffs who were advised by the EEOC of their right to bring suit on their sex discrimination charges. See p. 50, Memorandum Decision. The Court finds no basis for a change in that finding.

The case also came before the Court on the objections of the defendant Colgate to the bill of costs filed by plaintiffs' counsel and to the statements of costs filed by certain named plaintiffs independently of counsel. After considering the objections and the responses thereto, the items of costs in the following amounts are to be allowed and awarded the plaintiffs or their counsel:

Fees of the Clerk ........................................ 15.00
Fees of the Marshal ...................................... 49.72
Fees of the Court Reporter for all or
 any part of the transcript necessarily obtained for use in the
 case ................................................. 524.07
Fees and disbursements for printing ........................ 28.60
Fees for witnesses:
 Frank Mauk ...................... 52.24
 King Blakely ..................... 96.48
 Ruth Kendall .................... 39.60
 Ruth Lenfert .................... 54.24
 Linda Macy ...................... 54.24
 Tommy Daniels .................. 54.24
 Virginia Yates .................. 96.48
 447.52

Docket fees under 28 U.S.C. § 1923 ..................... 20.00
Costs incident to taking depositions:
 Vascimini ...................... 44.25
 Shoening ....................... 60.25
 Baker, Bell and Horner ............ 32.75
 Dorothy Young .................. 14.25
 151.50

The following named plaintiffs independent of counsel and on their own behalf submitted statements wherein they ask for loss of wages, per diem expenses and traveling expenses:

Lena Bell ..................... 103.70
Thelma Bowe ................1,377.48
Anna H. Casey ..............1,312.22
Anna D. Huff ................1,312.22
Mary A. Lee .................. 666.30
Lena G. Moore .............1,469.46
Georgianna Sellers ...........1,734.18
Mary E. Stum ................ 103.70
Lillie Whitman ............... 314.43

■■ These statements will not be allowed and the objections of Colgate to their allowance is SUSTAINED. Wages are not taxable costs, and transportation and per diem expenses are not allowable where such items are billed by plaintiffs who are parties to the action.

It is so ordered.

### JUDGMENT

The Court in this action, having considered the pleadings and the evidence and having been advised by arguments and briefs of counsel for all the parties, now hereby ORDERS, ADJUDGES AND DECREES:

All of the original complaints, substituted complaints, amended complaints, supplemental complaints, intervening complaints, cross-complaints, counterclaims and all other complaints and claims of any kind or character by any complainant of any type against any party hereto be and the same are now hereby dismissed except for injunction against plaintiffs hereinafter granted and except the allegations of discrimination by the defendant, Colgate-Palmolive Company, against the plaintiffs hereinafter named by reason of the lay-off of said plaintiffs by the defendant, Colgate-Palmolive Company, on either November 12, 1965 or November 19, 1965, and by virtue of said allegations and said discrimination it is ORDERED AND ADJUDGED that each of the plaintiffs hereinafter named recover of the defendant, Colgate-Palmolive Company, as damages the sum set opposite her name below, without interest except from the date of entry of this judgment:

Thelma Bowe ............ 1,409.16
Isabelle Jackson .......... 1,511.76
Georgianna Sellers ....... 1,475.76
Lena Moore ............. 1,511.76
Anna H. Casey .......... 1,511.76
Anna D. Huff ........... 1,511.76
Mary E. Stum .......... 1,475.76
Delores Bartle .......... 1,547.76
Verner Boothe .......... 1,551.76
Mary Blakely ........... 1,483.76
Geneva Whittinghill ...... 66.60
Dorothy Young .......... 883.20

All complaints and claims of every kind and denomination, in so far as they sought or seek any restraining order or injunction or any basis therefor are hereby dismissed excepting only that all plaintiffs and complainants herein whether named or unnamed, are hereby enjoined and barred from presenting, pursuing or attempting to litigate under the grievance and arbitration provisions of the labor contract between their Union, International Chemical Workers Union and its Local #15 or in any other forum their claims, if any they may have, arising out of alleged discrimination against them by the defendant, Colgate-Palmolive Company, before and during the pendency of this case in this court and up until the date of the entry of this judgment. Such claims as may arise after the date of the entry of judgment in this action by this court are not hereby enjoined and barred.

Each party to this action shall bear and pay all of his own costs of every kind incidental thereto except only that the plaintiffs may recover of the defendant, Colgate-Palmolive Company, their costs laid out and expended and allowed by the court's entry of this date relating to costs.

The plaintiffs' attorney, David L. Gittleman, shall recover of the defendant, Colgate-Palmolive Company, as his attorney's fee in this action, the sum of

Eleven Thousand Dollars ($11,000.00), without interest, and the plaintiffs' attorney, Daniel B. Burke, Jr., shall recover of the defendant, Colgate-Palmolive Company, as his attorney's fee in this action, the sum of One Thousand Five Hundred Dollars ($1,500.00), without interest.